IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 10, 2021 Session

## RONALD DAVID HARRIS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**No. 75CC1-2018-CR-80100      David M. Bragg, Judge**

_____

**No. M2020-01619-CCA-R3-PC**

_____

The petitioner, Ronald David Harris, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel in conjunction with his guilty pleas. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Darwin K. Colston, Murfreesboro, Tennessee, for the appellant, Ronald David Harris.

Herbert H. Slatery III, Attorney General and Reporter; Brandon James Smith, Assistant Solicitor General; Jennings H. Jones, District Attorney General; and Sharon L. Reddick and Matthew Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

The petitioner was charged in Rutherford County with thirteen counts of statutory rape by an authority figure, thirteen counts of especially aggravated sexual exploitation of a minor, and one count of sexual exploitation of a minor (over 100 images) after photographs and videos depicting sexual activity between him and his stepdaughter were discovered on an external hard drive for his computer. The petitioner pled guilty to three counts of especially aggravated sexual exploitation of a minor and was sentenced to ten years on each count, to be served consecutively for an effective term of thirty years. The

petitioner was also indicted for nine sexually related felony offenses in Wilson County, which were ultimately resolved in the same negotiated plea agreement with his plea to one count of rape of a child in exchange for a sentence of twenty-five years concurrent with his Rutherford County sentence.

To provide background for the case, we note the State's recitation of facts giving rise to the charges at the petitioner's guilty plea hearing:

[H]ad this matter . . . proceeded to trial, the State's witnesses would be available and would testify that [the petitioner] is the stepfather and was married to the mother of the victim named in the indictment whose date of birth is 1-8-2001.

The family all lived together in Wilson County prior to moving to La [V]ergne, Tennessee here in Rutherford County approximately a year or so prior to the events alleged in this particular indictment. They lived together in Rutherford County at [] here in La [V]ergne.

And on August the 22nd of 2016, the victim's mother walked into the La [V]ergne Police Department to report that she had found a hard drive that she indicated to officers belonged to [the petitioner]. And that contained on that hard drive were images and videos depicting sexual contact between her husband, [the petitioner], and the minor victim in this matter.

Detectives spoke with the victim's mother and secured a search warrant on the property. They executed the search warrant and seized a number of electronic items, including the hard drive in question.

Detectives did a forensic analysis of this hard drive and found multiple videos and images of sexual activity – depicting sexual activity between [the petitioner] and his, at the time, 15 year-old stepdaughter.

. . . .

[The petitioner] was interviewed by detectives, and he acknowledged some sexual contact with this victim. He acknowledged that there would be some videos. It's clear in the videos that [the petitioner] is the one who set up the cameras and created the images.

Subsequent to the search warrant being executed, the minor victim was forensically interviewed. And she indicated that the sexual contact

began when the family still lived in Wilson County, and began when she was about 12 years old. [The petitioner] is also charged with multiple counts of rape of a child in Wilson County.

The petitioner filed a pro se petition for post-conviction relief, and thereafter, two amended petitions were filed by appointed counsel. Various allegations were raised in the petitions, including the two ineffective assistance of counsel claims pursued on appeal: counsel was ineffective in failing to file a motion to suppress the digital evidence based on the precedent in *United States v. Lichtenberger*, 786 F.3d 478 (6th Cir. 2015), and in convincing the petitioner to plead guilty rather than zealously defend him.

The post-conviction court conducted an evidentiary hearing at which Detective Matt Fracker with the La Vergne Police Department, Detective Tyler Smith with the Murfreesboro Police Department, Assistant District Attorney Sharon Reddick, the petitioner's trial counsel, and the petitioner testified.

Detective Matt Fracker testified the petitioner's then-wife, J.H.[1], came to the police department and reported the allegations against the petitioner. J.H. informed the detective she discovered an external hard drive in the petitioner's dresser drawer inside a pair of his swimming shorts. She connected the hard drive to her computer and saw a file folder labeled "San Diego Chargers" with the thumbnail image a picture of her daughter, the victim. She opened the folder and saw multiple sexually explicit pictures and videos of her daughter. She copied the digital files to another external hard drive, which she provided to Detective Fracker.

Detective Fracker accessed the hard drive on the police department's offline computer. He noted there were "thousands of pictures of child pornography"; specifically, photos of both the victim and her sister and videos of the victim. Detective Fracker pulled up the first ten to twenty files or images within the "San Diego Chargers" folder in order for J.H. to identify her daughter and the petitioner. Detective Fracker did not know if he viewed the exact files J.H. had viewed before she brought the hard drive to the police.

Detective Fracker recalled asking J.H. for consent to search her home, and she consented both orally and in writing. Officers detained the petitioner until the search warrant arrived and then a search of the home was conducted. Several electronic devices were seized during the search, including the hard drive J.H. had found in the petitioner's

---

[1] It is the policy of this Court to protect the identity of minors by only identifying them by initials. In furtherance of this policy, we will also refer to the victim's mother by her initials. No disrespect is intended.

dresser drawer. The seized items were sent to Murfreesboro Criminal Investigations Division ("C.I.D.") for processing. Detective Fracker later viewed more of the seized digital information at the Murfreesboro C.I.D. office, and he characterized the images and videos as "disturbing. . . . It was an adult having sexual intercourse with a child. . . . [T]here were over 4,000 images."

Detective Fracker testified that the victim was forensically interviewed, during which she disclosed multiple instances of sexual penetration perpetrated against her by the petitioner. The victim was unable to give an exact number of occurrences because "it was too many to even try to count." The victim said the sexual abuse started when she was twelve years old while the family was living in Wilson County. Detective Fracker interviewed the petitioner, and the petitioner admitted to having repeated sexual contact with the victim and video recording it.

Detective Fracker interviewed and spoke with J.H. on multiple occasions through email, phone calls, and in person, and he concluded there was no reason to request an indictment against her. Once criminal prosecution commenced against the petitioner, the petitioner filed a motion for J.H.'s laptop. Subsequently, her laptop and its hard drive were turned over to the Murfreesboro Police Department.

Detective Tyler Smith conducted the digital forensics examination of the electronic storage devices seized in this case. Detective Smith processed twenty-one devices from which he uncovered 4533 files containing child sexual abuse material, 4238 of which were of the petitioner and the victim. This total does not include duplicates of the files found on the hard drive in the petitioner's dresser drawer, which were also found on other devices seized from the home. According to Detective Smith, it was clear from the files that the petitioner was the one setting up the video and that there was no evidence of any criminal culpability on the part of J.H. Detective Smith's digital forensics examination of the seized devices also uncovered typical non-illegal material.

General Sharon Reddick prosecuted the petitioner in the underlying matter and recalled only one pretrial motion being litigated. The motion involved the petitioner's request for any electronic equipment in the possession of J.H. which he believed might be useful to his case. As a result, J.H. was ordered to turn over her laptop, and a mirror image of her hard drive be secured by the State and made available to the defense. However, it was not clear whether defense counsel ever examined the information on J.H.'s hard drive because they started discussing a plea agreement. The petitioner insisted there was some wrong-doing on the part of J.H. but could never "articulate anything that rose to criminal culpability." General Reddick noted, "[a]t some time [the petitioner] wanted [the victim] prosecuted as well."

- 4 -

General Reddick recalled there was sufficient evidence the petitioner committed the offenses in addition to the digital files, including his admission during his original interview to having an on-going sexual relationship with the victim, disclosures by the victim of multiple instances of sexual penetration by the petitioner, and multiple letters written by the petitioner to the victim, J.H., and the prosecutors acknowledging the sexual contact with the victim.

The petitioner's trial counsel testified that he only represented the petitioner on his Rutherford County charges and that he visited the petitioner approximately thirty times at the jail. Counsel filed various motions in circuit court, as well as a subpoena for access to J.H.'s laptop computer. Counsel recalled the petitioner was concerned with accessing J.H.'s computer because he believed it would inculpate her in criminal activities. The petitioner talked to counsel about allegations of criminal conduct on the part of J.H. and also at various times blamed the victim for some of his criminal behavior. Once J.H.'s hard drive was taken into custody, counsel did not view its contents but knew the evidence was there if he needed it. Counsel continued,

> [A]t that point I began to look more at the evidence that was in the custody of the State.
>
> And when I saw what the State had against him – I saw numerous confessions. I saw videos with his face right there at the front of it, and then proceeding to do what he was accused of doing, at that point it became my focus – I guess my focus more than anything became . . . what are the things I can control, what are the things I can address.
>
> And to me, a tangential allegation that someone else . . . saved the videos or the images in question largely to me was irrelevant as to how they got there. I'm worried about, you know, how do I address my client's main concerns here." (pg. 62-63)

Counsel elaborated there was a "mountain of evidence" against the petitioner, and counsel did not think allegations concerning J.H. would have reduced the petitioner's culpability in the eyes of the jury.

Trial counsel considered filing a motion to suppress, but he and the petitioner did not have a direct conversation about his doing so. He elaborated, "[W]hen I see that my client has tremendous evidence against them, the first thing I look to is whether or not the search warrant would stand up. So, I don't remember exactly what I may have researched. But, of course, that's always on my mind."

Trial counsel had several conversations with Detective Fracker and was aware how the digital evidence was obtained to get the search warrant for the petitioner's home. Asked if he was familiar with the Sixth Circuit case of *Lichtenberger*, counsel replied, "Not offhand." Counsel reviewed the seized digital evidence at the police department and was also given copies of letters written by the petitioner wherein he admitted to sexually penetrating his stepdaughter.

After reviewing all the evidence provided to him in discovery, trial counsel felt it was appropriate to start discussing a possible plea agreement with the petitioner. He had several conversations with the petitioner in that regard, and counsel negotiated a global settlement disposing of all the criminal allegations against the petitioner. Counsel sent a letter to the petitioner outlining the possible sentence ranges he faced on each of his charges and counsel's recommendation to accept the State's plea offer. Prior to the petitioner actually entering the plea, counsel went over the negotiated plea agreement with the petitioner and had him initial every provision to ensure he understood. Given counsel's thoroughness and the petitioner's intelligence, counsel believed there was "no reason why he wouldn't have understood what we were doing."

Trial counsel recalled that on the morning of the plea hearing, the petitioner requested to speak with a male prosecutor from the district attorney's office because he was concerned that the female prosecutor assigned to his case was biased because of her gender. The petitioner sat down with counsel and a male prosecutor and discussed his theory of J.H.'s criminal liability and, after doing so, entered his plea.

The petitioner was the last to testify at the evidentiary hearing. A large part of the petitioner's testimony concerned his desire for trial counsel to obtain a mirror image of J.H.'s computer because she had moved out of state. The petitioner claimed J.H. told Detective Fracker that she learned about the improper things going on between the petitioner and her daughters two years earlier when she found nude photographs of the petitioner and the girls on a camera. The petitioner believed J.H.'s computer contained evidence she had knowledge of his sexual abuse of the victim and her threatening to turn him in if he did not allow her to move to Las Vegas with the children. However, the petitioner acknowledged J.H.'s actions would not lessen his culpability, but he claimed there was "selective prosecution" by the State.

The petitioner also testified that he discussed with trial counsel his desire for counsel to file a motion to suppress the search of the hard drive discovered by J.H.. He claimed J.H. had control of the hard drive found in his swim shorts "for a long time . . . [because] she was extorting [him]." He asserted that J.H. knew the abuse was going on and did not care and that she did not have permission to take the hard drive from his dresser drawer.

The petitioner disputed trial counsel's claim to have visited him thirty times and claimed he "was not able to see really any of this discovery." The petitioner averred trial counsel threatened to withdraw from his case if the petitioner did not retract complaints he had filed against counsel with the Board of Professional Responsibility. When counsel advised the petitioner not to go to trial and did not listen to the petitioner's "own ideas on defense strategies," the petitioner began to feel counsel "might not be my guy" and "had given up on [him]."

The petitioner ultimately felt he had no other option than to continue with counsel representing him and to plead guilty. He particularly felt this way after counsel warned him "if [the victim] were to get up on the stand and cry, that 12 jurors would basically crucify me, and I would get, what, 13 charges times 30 years. Like 190 years or something crazy." He expressed, "So, I literally felt I had no options. None. None. Especially after not trying to suppress any of that evidence."

On cross-examination, the petitioner rehashed his claim that J.H. knew about the sexual abuse and did not turn him in sooner because she was extorting him for money. He also expounded on his allegations that J.H. should have been prosecuted and that he was "targeted by" the district attorney. When asked about his claim that one of his reasons for waiving a preliminary hearing was to protect the victim, the petitioner explained he was concerned about how sexually explicit photographs and videos of the victim being made public would affect her honor and dignity.

At the conclusion of the hearing, the post-conviction court denied the petitioner's claims. As to the petitioner's allegation regarding trial counsel's failure to challenge the search of his hard drive, the post-conviction court noted counsel's testimony that "had there been any issues that were subject to suppression based on fourth amendment grounds, that would be the course of action he would have taken. . . . [S]uppressible issues are some of the first things he considers when determining the strategy for a case." Along the same lines, the post-conviction court found the petitioner's argument concerning the private search doctrine as enunciated in *Lichtenberger*, that the search of his hard drive by police exceeded the scope of his wife's initial search of the device, to be without merit. The court determined there was "no evidence the subsequent viewing of the device exceeded the scope of the private search . . . [and] [t]he case is factually distinct from *Lichtenberger*." The court concluded "[t]here were no search and seizure issues relating to the actions of law enforcement in this case that [trial counsel] could have successfully [] raised that would rise to the level of ineffective assistance of counsel under either prong of the *Strickland* Test."

With regard to the petitioner's allegation that trial counsel failed to zealously defend him and, instead, convinced him to take a plea, the post-conviction court noted the

petitioner faced a significantly longer sentence if convicted after a trial than what he received under the plea. The post-conviction court implicitly accredited the decision by trial counsel to shift his strategy from preparing for trial to negotiating the best possible deal for the petitioner after trial counsel was confronted with the discovery in the case and the reality that "the presentation of that discovery would be devasting to [the petitioner]'s defense."

### *Analysis*

The petitioner asserts trial counsel was ineffective for advising him to plead guilty and failing to contest the search of his hard drive by the police, which was the "only tactical defense available" given the "the overwhelming evidence against him." The State contends trial counsel's assistance "was not deficient nor was the petitioner prejudiced by the actions of his trial counsel." The State notes that trial counsel reasonably concluded that a plea was in the petitioner's best interest, and moreover, the petitioner never claimed he would have gone to trial had counsel filed a motion to suppress. Upon our review, we affirm the decision of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

A guilty plea must be knowingly, voluntarily, and intelligently entered in order to be valid. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010). The court must determine whether the guilty plea evidences a voluntary and informed decision to pursue a guilty plea in light of the alternative options available to the defendant. *Id*. In the context of a post-conviction challenge to a guilty plea, both prongs of the *Strickland* test must be met. *Garcia v. State*, 425 S.W.3d 248, 256 (Tenn. 2013). Thus, to successfully challenge his guilty plea, the petitioner must show counsel's performance was deficient, and he "must establish a reasonable probability that, but for the errors of his counsel, he would not have entered the plea." *Adkins v. State*, 911 S.W.2d 334, 349 (Tenn. Crim. App. 1994) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *Garcia*, 425 S.W.3d at 257.

Again, the petitioner argues trial counsel was ineffective because counsel focused on obtaining a plea agreement for the petitioner rather than "zealously defending" him and/or challenging the search of his hard drive by the police. Upon review, we conclude trial counsel's decision to focus on obtaining the best possible plea agreement for the petitioner did not fall below an objective standard of reasonableness under prevailing

professional norms. In counsel's words, there was a "mountain of evidence" against the petitioner, including not only the 4000-plus photographs and videos of the petitioner sexually abusing a minor, but also his admission to having an on-going sexual relationship with the victim, disclosures by the victim of multiple instances of sexual penetration by the petitioner, and multiple letters written by the petitioner to the victim, J.H., and the prosecutors acknowledging the sexual contact with the victim. Counsel reviewed this evidence and, knowing the vast sentence the petitioner faced if convicted at trial, advised the petitioner to take a plea. We discern no deficiency in counsel's strategy.

In addition, *Lichtenberger*, the authority the petitioner cites in support of suppression of the digital evidence, is merely persuasive authority and, even if relied on, the petitioner failed to show a reasonable probability that a motion to suppress based upon *Lichtenberger* would have been granted. The Fourth Amendment acts as a restraint only on government actors, not private citizens. "The essence of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). Therefore, a search by a private citizen, even if unreasonable, is beyond the protection of the Fourth Amendment. *United States v. Jacobson*, 466 U.S. 109, 113-14 (1984). Moreover, "[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information[.]" *Id.* at 117. "The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id.*

In *Lichtenberger*, the defendant's girlfriend hacked into his computer, discovered thumbnail images of adults engaging in sexual acts with minors, and contacted the police. When an officer arrived at the residence, the girlfriend informed him that she hacked the computer belonging exclusively to the defendant and found child pornography. The officer then asked the girlfriend to show him what she had discovered. The girlfriend displayed to the officer not only the images that she had recovered during the private search, but also displayed additional images of child pornography. The officer directed the girlfriend to shut down the computer and seized it.

The court concluded that the private search doctrine applied because the defendant's girlfriend acted solely as a private citizen when she searched the defendant's computer, invited the officer into the residence, and showed the officer what she had found. Pursuant to *Jacobsen*, the court agreed with the district court that the case presented an "after-the-fact confirmation of a private search." *Id.* at 484. The court then viewed the next inquiry under *Jacobsen* as whether the officer's search remained within the scope of the private search. *Id.* at 485. The court acknowledged how "searches of physical spaces and the

items they contain differ in significant ways from searches of complex electronic devices under the Fourth Amendment." *Id.* at 487 (referencing *Riley v. California*, *supra*). The court reasoned that the magnitude of private information retained in a computer manifested itself in *Jacobsen*'s requirement that the officer has to proceed with "virtual certainty" that the inspection of the laptop and its contents would not tell the police anything more than they had already learned from the individual who conducted the private search. *Id.* at 488. Stated differently, when the governmental viewing is limited to the scope of the private search, the magnitude of confidential files and information contained in one's computer is protected from the prying eyes of the government unless and until a warrant is obtained. Absent a warrant, the government may view only those files that were disclosed pursuant to the private search.

From the proof at the evidentiary hearing, we glean that when J.H. viewed the data on the petitioner's hard drive, she saw a file folder labeled "San Diego Chargers" with a photo of the victim as the thumbnail image for the folder. She opened the file folder and "found all the photos and videos." She copied the data onto another hard drive and took it to the police. Detective Fracker pulled up the first ten to twenty files or images within the "San Diego Chargers" folder in order for J.H. to identify her daughter and the petitioner. Although when questioned Detective Fracker was not sure whether he viewed the exact files J.H. viewed before bringing in the hard drive, the petitioner did not present any proof Detective Fracker exceeded the scope of the private search and Detective Fracker's viewing merely ten to twenty images out of thousands seems virtually certain to be within the same scope as J.H.. The results of J.H.'s review of the hard drive were described as her finding **multiple** sexually explicit pictures and videos of her daughter and finding "**all** the photos and videos." Thus, based on the evidence presented, there is no proof that Detective Fracker's review of the hard drive exceeded J.H.'s search. Moreover, it is clear from the proof that based on the extent of J.H.'s search, her statement to Detective Fracker, and the fact that the images viewed by both J.H. and Detective Fracker were all located within a file labeled with a picture of the victim that Detective Fracker could be "substantially certain" any picture he viewed contained child pornography.

Our reasoning is consistent with the reasoning of another panel of this court in *State v. Eugene O. Dale*, when analyzing a similar situation:

> Appellant argues that Officer Darling's search of the computer was beyond the scope of the private party search because, he claims, Officer Darling and [the private party] enlarged images, looked at information [the private party] had not previously seen, and looked at more images than [the private party] saw initially. At the motion hearing, [the private party] described the images he saw on appellant's computer as depicting females, ages five to thirteen years old, some of whom were engaged in oral or

penetrative sex. [The private party] testified that when he opened the folder, all of the images in the folder were "exposed" as thumbnails. Therefore, it did not exceed the scope of [the private party]'s initial search for Officer Darling to look at enough images to ensure that the images were child pornography. While the testimony at the hearing did not establish whether [the private party] and Officer Darling actually enlarged the images or opened the images rather than merely viewing the thumbnails, any such action would not have exceeded the scope of the private party search.

No. E2012-02418-CCA-R3-CD, 2013 WL 4459012, at *6 (Tenn. Crim. App. Aug. 19, 2013), *perm. app. denied* (Tenn. Jan. 14, 2014).

Furthermore, even if trial counsel had filed and the trial court granted a motion to suppress the digital evidence, the petitioner has failed to prove he would have gone to trial rather than enter a guilty plea. At the conclusion of his guilty plea hearing, the petitioner was given the opportunity to make a statement on the record during which he expressed his primary reason in pleading guilty was to protect the victim because he did not want her dignity and privacy compromised by having to go through a trial. The petitioner reiterated this sentiment at the post-conviction evidentiary hearing, and he also indicated concern over the effect the victim's testimony could have on a jury and "that 12 jurors would basically crucify me, and I would get, what, 13 charges times 30 years. Like 190 years or something crazy." We also note the petitioner's overwhelming concern during his testimony at the evidentiary hearing was not in demonstrating he would not have pled guilty had counsel sought suppression of the digital evidence but, instead, in trying to implicate J.H. in some sort of criminal liability and expressing his discontent she had not been charged.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE