NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0624n.06

Case No. 17-3933

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 18, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| JOSHUA CHAPMAN-SEXTON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| _____ | ) | |

**BEFORE: GILMAN, KETHLEDGE, and BUSH, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.** Joshua Chapman-Sexton was convicted of receiving and possessing child pornography. He challenges the district court's denial of his motion to suppress evidence and the court's application of a sentencing enhancement. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.    INTRODUCTION

### A.    Factual background

On February 28, 2016, officers from the Buckeye Lake Police Department (BLPD) attempted to stop D.J., a minor, from engaging in a fistfight with another individual. D.J. was with his two adult friends, Deven Coleman and Christian Gullett. The officers arrested D.J., who then

confessed that he, Coleman, and Gullett had stolen items from Chapman-Sexton's apartment. Among those items was a flash drive.

BLPD Chief Jim Hanzey later spoke with Chapman-Sexton, who confirmed that his PlayStation 4 and a few other items had been stolen. Because Chapman-Sexton had a prior conviction for possessing child pornography, he was required as a condition of his supervised release to notify his probation officer within 72 hours of being arrested or questioned by a law-enforcement officer. Chapman-Sexton accordingly called his probation officer after speaking with Chief Hanzey.

When Chief Hanzey subsequently spoke with Coleman, Coleman informed Chief Hanzey that both the PlayStation 4 and the flash drive contained child pornography. Coleman claimed that he had watched child pornography on these devices with Chapman-Sexton. He also said that Chapman-Sexton had engaged in sexual conduct with C.B., a 13-year-old boy, and that the boy's boxers were still in Chapman-Sexton's apartment.

The BLPD and Chief Hanzey had previously received incriminating information from Coleman regarding the illegal activity of others, some of which was not reliable. Nevertheless, Chief Hanzey testified that he found Coleman's statements regarding Chapman-Sexton credible because he knew that Chapman-Sexton was a registered sex offender with a federal conviction for possessing child pornography.

After speaking with Chapman-Sexton and Coleman, Chief Hanzey conducted a limited search of the flash drive to confirm Coleman's accusations. He observed three images depicting naked male children or male children engaged in sex acts, at which point he stopped searching the flash drive. Chapman-Sexton then came to the police station and confirmed that the PlayStation 4 and the flash drive belonged to him.

A state prosecutor subsequently drafted an affidavit in support of a warrant to search Chapman-Sexton's apartment. The affidavit set forth that Coleman and others had stolen electronic devices from Chapman-Sexton, that Chapman-Sexton confirmed that these devices were his, that Coleman alleged that the devices contained child pornography, and that Coleman claimed to have watched child pornography on these devices with Chapman-Sexton. It also stated that Chapman-Sexton had been recently released from prison for possessing child pornography and that Coleman had accused Chapman-Sexton of engaging in sexual activity with C.B. Moreover, the affidavit disclosed Chief Hanzey's limited review of the flash drive's contents. A state-court judge issued a search warrant later that day and the police promptly searched Chapman-Sexton's apartment.

The police obtained a second warrant two days later to search the flash drive and other electronic devices gathered from both the burglary and the apartment. Chief Hanzey then resumed his review of the flash drive and observed 13 photographs depicting young males "naked and performing oral sex on adults." He subsequently called Chapman-Sexton's probation officer and discussed the child-pornography allegations.

The above actions caused law-enforcement agents to contact the FBI Child Exploitation Task Force. This in turn prompted the FBI to obtain a federal warrant to search the electronic devices in question. Upon searching Chapman-Sexton's devices, the FBI discovered repeated visits to a Russian child-pornography website, videos of young males masturbating, images of naked children and children engaged in sex acts, and text messages between Chapman-Sexton and C.B. that suggested sexual contact. Among those messages was one where Chapman-Sexton told C.B.: "I love you too, now delete these messages," and C.B. replied: "We are really just friends with benefits, not a couple, okay?"

B.      **Procedural background**

A grand jury indicted Chapman-Sexton on two counts of receiving child pornography and on one count of possessing child pornography. All of the video and images supporting the indictment were on the flash drive. Chapman-Sexton moved to suppress any evidence obtained from the forensic examination of his flash drive, arguing that Chief Hanzey's initial review violated Chapman-Sexton's constitutional rights and that all subsequent searches were inadmissible as "fruit of the poisonous tree." His motion was denied. *United States v. Chapman-Sexton*, No. 2:16-cr-141, 2017 WL 476737 (S.D. Ohio Feb. 3, 2017). The district court found that Chief Hanzey's warrantless review of the flash drive was indeed unlawful, but concluded that the evidence was nevertheless admissible under the independent-source doctrine. *Id.* at *4–6.

Chapman-Sexton was convicted by a jury on all three counts. At sentencing, the district court found that Chapman-Sexton had "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." It thus applied a five-level sentencing enhancement under U.S.S.G. § 2G2.2(b)(5). This pattern-of-activity finding was based on evidence that Chapman-Sexton had previously sexually abused Coleman and had recently sexually abused C.B. These accusations were supported by Coleman's trial testimony, FBI interviews of Coleman and C.B., an officer's interview of C.B.'s mother, and text messages sent between Chapman-Sexton and C.B.

Chapman-Sexton received two 292-month sentences and one 120-month sentence, to be served concurrently. This timely appeal followed.

## II.    ANALYSIS

### A.    Standard of review

#### 1.    *Motion to suppress evidence*

When a defendant appeals the denial of a motion to suppress evidence, we "review the district court's findings of fact under the clear-error standard and its conclusions of law de novo." *United States v. Quinney*, 583 F.3d 891, 893 (6th Cir. 2009). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (citation and internal quotation marks omitted).

#### 2.    *Sentencing*

"Sentences in criminal cases are reviewed for both procedural and substantive reasonableness." *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012). When reviewing a sentence for procedural reasonableness, we evaluate whether the district court

> (1) properly calculated the applicable advisory Guidelines range; (2) considered the § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the chosen sentence, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range.

*United States v. Petrus*, 588 F.3d 347, 351–52 (6th Cir. 2009). "The sentence may be substantively unreasonable if the district court chooses the sentence arbitrarily, grounds the sentence on impermissible factors, or unreasonably weighs a pertinent factor." *United States v. Brooks*, 628 F.3d 791, 796 (6th Cir. 2011). We generally apply the abuse-of-discretion standard to review

sentences for procedural and substantive reasonableness. *United States v. Bass*, 785 F.3d 1043, 1050 (6th Cir. 2015).

**B.      Motion to suppress evidence**

The district court denied Chapman-Sexton's motion to suppress the evidence from the flash drive, relying on the independent-source doctrine.  This doctrine "holds that evidence will be admitted if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).  So evidence obtained pursuant to a search warrant that relied, in part, on unlawfully obtained information may nevertheless be admissible under the independent-source doctrine.  As explained in *Jenkins*, "[i]f the application for a warrant 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry.'"  396 F.3d at 758 (quoting *United States v. Herrold*, 962 F.2d 1131, 1141–42 (3d Cir. 1992)); *see also Murray v. United States*, 487 U.S. 533, 542 & n.3 (1988) ("To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred . . . .").

The district court analyzed the first prong of *Jenkins* and determined that probable cause existed to support the search even without considering the tainted initial search of the flash drive by Chief Hanzey.  But the court failed to consider the second prong of *Jenkins*—i.e., whether the law-enforcement officer was "prompted to obtain the warrant by what [he] observed during the initial entry." *See Jenkins*, 396 F.3d at 758.  We have grave doubts as to whether this second prong was met because Chief Hanzey expressed concern that the prosecutor's office would not seek a search warrant unless he first confirmed that the flash drive contained child pornography.

But we are free to affirm the judgment of the district court on any ground supported by the record, including a ground not articulated by the lower court. *United States v. Binford*, 818 F.3d 261, 267 (6th Cir. 2016). One alternate ground to support the decision denying Chapman-Sexton's motion to suppress is the inevitable-discovery exception. As articulated in *United States v. Keszthelyi*, 308 F.3d 557 (6th Cir. 2002), the inevitable-discovery exception "applies when . . . evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first." *Id.* at 574.

The record supports the application of this exception because Chief Hanzey had more than enough facts to contact Chapman-Sexton's probation officer even before he looked at the contents of the flash drive, and Chief Hanzey had every reason to do so. Chapman-Sexton, moreover, had independently contacted his probation officer as he was required to do by the terms of his supervised release.

The probation officer, in turn, would have inevitably wanted to examine both the PlayStation and the flash drive that had been stolen from Chapman-Sexton's residence and that were now in Chief Hanzey's possession. A flash drive "is readily usable as a means to conceal prohibited images from discovery," *United States v. Makeeff*, 820 F.3d 995, 1001–02 (8th Cir. 2016), and the probation officer would likely suspect that Chapman-Sexton was concealing child pornography.

The probation officer, in fact, promptly contacted federal law-enforcement authorities. After this contact, a federal prosecutor and the FBI Child Exploitation Task Force took over the investigation from Chief Hanzey, obtained a warrant from a federal magistrate judge, and then lawfully conducted a search of the PlayStation and the flash drive.

The inevitable discovery exception therefore applies in this case because "routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *See Keszthelyi*, 308 F.3d at 574 (quoting *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999)). We thus conclude that the incriminating evidence against Chapman-Sexton would have been inevitably discovered by the government even without Chief Hanzey's initial prewarrant search of the flash drive.

## C. Sentencing enhancement

Next we evaluate Chapman-Sexton's challenges to his sentence. First, he argues that the district court inappropriately applied a five-level sentencing enhancement for engaging in a "pattern of activity involving the sexual abuse or exploitation of a minor." Second, Chapman-Sexton claims that the consideration of uncharged conduct in determining his sentence is inconsistent with the holding in *Nelson v. Colorado*, 137 S. Ct. 1249 (2017).

### 1. *Procedural challenge*

Chapman-Sexton argues that his sentence is procedurally unreasonable because the district court applied the pattern-of-activity enhancement under U.S.S.G. § 2G2.2(b)(5). Under the Sentencing Guidelines, an individual convicted of a child-pornography charge may receive a five-level sentencing enhancement if the court finds, by a preponderance of the evidence, that he has "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." *Id.* This is defined as "any combination of two or more separate instances of the sexual abuse or exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." *Id.* cmt. 1.

Chapman-Sexton claims that the government did not prove by a preponderance of the evidence that Chapman-Sexton engaged in such a pattern of activity. To establish the pattern-of-activity enhancement, the district court considered the statements and information provided by Coleman, statements from C.B., and text messages between C.B. and Chapman-Sexton. Chapman-Sexton argues that these statements and information are not credible and do not provide sufficient support for the enhancement. Disputed facts, however, "do not make evidence insufficient." *United States v. Paull*, 551 F.3d 516, 527 (6th Cir. 2009). The district court made factual findings based largely on witness credibility, and "this court affords great deference to such credibility determinations." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). For those reasons, we do not find any error in the court's procedural determination of Chapman-Sexton's sentence.

### 2. *Constitutional challenge*

Chapman-Sexton also posits that the application of the pattern-of-activity sentencing enhancement conflicts with the Supreme Court's rationale in *Nelson*. The defendants in *Nelson* were found guilty of crimes involving sexual assault, sentenced to jail, and ordered to pay court costs, fees, and restitution. On appeal, their convictions were either overturned or vacated. Following that, the defendants were acquitted on retrial or not retried at all. The state, however, retained a portion of the defendants' money and would not return the funds unless a defendant could prove his or her innocence by clear and convincing evidence. The Supreme Court concluded that this procedure violated a defendant's due process rights: "[O]nce those convictions were erased, the presumption of innocence was restored." *Nelson*, 137 S. Ct. at 1255. As a result, the state had to return the defendants' money and could not impose any burden of proof on them.

Chapman-Sexton points to *Nelson* for the proposition that "the presumption of innocence lies at the foundation of our criminal law" and that the state "may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." *Id.* at 1256 (internal quotation marks omitted and emphasis in original). That proposition, however, does not bar criminal punishment for individuals convicted of a crime. *Nelson* provides that criminal punishment cannot be imposed on individuals found guilty of "no crime" at all. Chapman-Sexton, on the other hand, has been convicted of several crimes, and he thus may be criminally punished.

*Nelson*, moreover, does not *sub silentio* overrule *United States v. Watts*, 519 U.S. 148 (1997), which holds that a jury's verdict of acquittal on one of multiple charges "does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157. This is part of a sentencing judge's role in considering the defendant's character and conduct when determining a sentence. *Id.* at 154–55. In sum, the district court properly applied the Sentencing Guidelines in this case.

### III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.

**JOHN K. BUSH, Circuit Judge, concurring in part and concurring in the judgment.**

I concur in the majority's judgment and its underlying reasoning that the district court properly applied the Sentencing Guidelines to calculate Chapman-Sexton's sentence. However, I do not agree with the majority's conclusion that the evidence obtained as a result of Chief Hanzey's warrantless viewing of the flash drive is admissible under the inevitable-discovery exception to the exclusionary rule. Nonetheless, that evidence is admissible under the good-faith exception, and therefore I concur in the judgment with respect to the suppression issue, because a reasonable officer could have believed the private-search doctrine applied.

## I.

The majority correctly concludes that we cannot affirm based on the independent-source doctrine, because the district court failed to analyze the second, subjective element from *United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005): whether Chief Hanzey would have sought a search warrant absent the information obtained through his pre-warrant search of the flash drive. But the majority believes the inevitable-discovery doctrine dictates affirmance. I respectfully disagree.

The modern statement of the inevitable-discovery doctrine comes from *Nix v. Williams*, 467 U.S. 431 (1984), which involved a search for a murder victim's body. Police officers unlawfully persuaded the defendant to direct them to the corpse, *id.* at 435–36, but the Supreme Court held the evidence thus obtained was nevertheless admissible, *id.* at 449–50. The Court's rationale was that when police questioned the defendant and obtained his cooperation, volunteer search teams were within two and a half miles of the body. *Id.* at 448–50. Therefore, the Court concluded, the corpse would inevitably have been discovered, even if discovery would have taken longer, in the absence of the illegally obtained confession. *Id.*

Even though the independent-source exception did not apply in *Nix*, the Court noted that the rationale for that doctrine is similar to that of the inevitable-discovery exception:

> When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation. There is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place.

*Id.* at 443–44. Thus, the two doctrines are linked: neither exception applies unless the challenged evidence would have been obtained anyway absent the alleged misconduct. *See id.* at 444.

To rephrase this point based on the facts here, a necessary prerequisite for either the inevitable-discovery exception or the independent-source exception to apply is that the incriminating evidence would have necessarily been discovered even if Chief Hanzey had not examined the contents of the flash drive without a warrant. And just as the independent-source doctrine requires us to ask about the state of the world the moment before Chief Hanzey looked at the drive, the inevitable-discovery doctrine requires us "to determine, viewing affairs as they existed at the instant before the [allegedly] unlawful search, what would have happened had the . . . search never occurred." *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)). A preponderance of the evidence must support our finding of inevitability. *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) (citing *Nix*, 467 U.S. at 444). So we must ask whether a preponderance of the evidence supports the conclusion that, knowing what Chief Hanzey knew at the moment before he viewed the flash drive, law-enforcement authorities would inevitably have sought and obtained a warrant.

Unfortunately, the majority's analysis does not focus on "the instant before the [allegedly] unlawful search." *Leake*, 95 F.3d at 412. And its analysis puts too much strain on the concept of inevitability. The majority concludes that the evidence leading to Chapman-Sexton's conviction

would have been discovered because (1) "Chief Hanzey had more than enough facts to contact Chapman-Sexton's probation officer even before he looked at the contents of the flash drive, and Chief Hanzey had every reason to do so;"[1] (2) "Chapman-Sexton . . . had independently contacted his probation officer as he was required to do by the terms of his supervised release;" and (3) "[t]he probation officer, in turn, would have inevitably wanted to examine both the PlayStation and the flash drive" because "the probation officer would likely suspect that Chapman-Sexton was concealing child pornography." Majority Opinion at 7. The majority supports its conclusion that these suppositions make the inevitable-discovery doctrine applicable by pointing out that "[t]he probation officer, in fact, promptly contacted federal law enforcement authorities" after learning that Chapman-Sexton was under investigation by local authorities for child pornography-related offenses. *Id.*

These statements indicate that the majority assumes one of three possible courses of events was certain to occur in the absence of Chief Hanzey's warrantless search of the drive. Respectfully, I submit, each of these hypothetical chains of events contains fatally weak links.

The first scenario goes like this: (1) Chief Hanzey, based on talking to Coleman and on knowing that Chapman-Sexton had previously been convicted of sex offenses, would have gone to the Licking County Prosecutor's Office and proposed that it seek warrants to search Chapman-Sexton's home and the flash drive; (2) the Licking County Prosecutor's Office would have sought warrants based on Coleman's statement and on Chapman-Sexton's criminal history.[2]

---

[1] Whether or not Chief Hanzey "had every reason" to contact the probation officer, the relevant question is whether he inevitably would have done so.

[2] Chief Hanzey testified that he could not simply go to the magistrate and apply for a warrant in his jurisdiction. Instead, the jurisdiction's protocols required Chief Hanzey to go to the Prosecutor's Office with evidence and ask that office to create an affidavit and seek a warrant. (R. 49, Page ID 344.)

The likelihood that these two independent decisionmakers—Chief Hanzey and the Prosecutor's Office—would have acted as this hypothetical assumes is supported by the district court's conclusion that Chief Hanzey had probable cause to seek a warrant before he viewed the flash drive. *United States v. Chapman-Sexton*, Case No. 2:16-cr-141, 2017 WL 476737, at *6 (S.D. Ohio Feb. 3, 2017). And it is possible Chief Hanzey would have sought a warrant absent having viewed the drive. However, the question whether the Licking County Prosecutor's Office would "inevitably" have sought a warrant does not have a straightforward answer. Chief Hanzey, in fact, testified at the suppression hearing that a principal reason he viewed the flash drive before seeking a warrant was that he thought the prosecutor would want more than simply Coleman's statement, and the knowledge that Chapman-Sexton was a convicted offender, before requesting a warrant from the magistrate. (R. 49, Page ID 393–94.) Consider the following exchange from the suppression hearing:

> Q [W]hy did you look?
>
> A Because I wanted to make sure there was for myself, and to have something to bring to Licking County Prosecutor's Office.
>
> Q Why did you not think just Mr. Coleman's statement would be enough for the prosecutor?
>
> A Because our prosecutor's office likes for us to view the evidence.
>
> Q Well, then, why did you only look at three pictures?
>
> A Because after three pictures I believed that there was enough probable cause at that time to remove it from the computer and call our prosecutor's office and tell them what I had.

(*Id.*) And this exchange:

> Q What did you believe about whether or not the prosecutor would approve a search warrant without you looking at the thumb drive?

> A  I know Licking County.  Like I said, I've been working with them for over 31 years and I knew you had to bring something to the table before they would entertain the search warrant.

(*Id.* at 342.)  Even if Chief Hanzey had probable cause for a warrant before he looked at the flash drive, the Licking County Prosecutor's Office may not have agreed that there was probable cause. Therefore, the supposition that issuance of a valid warrant would have been inevitable fails on the circumstances of this case.

It is also doubtful, even putting aside the particular practices of the Licking County Prosecutor's Office, whether Chief Hanzey would have sought a warrant had he not looked at the flash drive.  His statements at the suppression hearing suggested mixed feelings as to whether he had probable cause for a warrant without seeing for himself whether there was pornography on the drive.  (*Compare* R. 49, Page ID 342 (After hearing Coleman's statement that Chapman-Sexton had child pornography on the flash drive and that Coleman had seen it, and knowing Chapman-Sexton's history, "I believe at that time I had probable cause to see if a crime had been committed.") *with id.* at Page ID 393–94  ("[A]fter three pictures I believed that there was enough probable cause at that time to . . . call our prosecutor's office . . . .") ("I needed to have probable cause.  That's why I looked, knowing [Chapman-Sexton's] background and then the statement I got from Devon [sic] Coleman.").)  This vacillating testimony is the reason the district court's independent-source analysis ran aground: that analysis was simply unclear as to the subjective likelihood that Chief Hanzey would have sought a warrant absent his looking at the flash drive. This uncertainty similarly prevents our finding that the evidence would inevitably have been discovered.

The second possible chain of events goes like this: (1) Chapman-Sexton's probation officer, based on his conversation with Chapman-Sexton the day after the burglary, would have

notified local authorities that Chapman-Sexton might have pornography on the flash drive or the stolen gaming system; (2) local authorities would have then sought a warrant for Chapman-Sexton's residence and the flash drive, based on the probation officer's statement and maybe also on Coleman's statement and Chapman-Sexton's criminal history.

This hypothetical chronology also fails to establish inevitable discovery absent Chief Hanzey's warrantless search. Chapman-Sexton did talk to his probation officer the day after the burglary, in compliance with a supervised-release term that required him to speak to his probation officer after interacting with law-enforcement officers. But the probation officer only heard—and apparently accepted at face value—Chapman-Sexton's unadorned statement that "a PlayStation and maybe games" had been taken.[3] (R. 68, Page ID 981.) The probation officer's testimony indicated he had not known that a flash drive had also been taken, much less that pornography was on the drive. He did not even know the PlayStation could be used to access the Internet. (*Id.* at Page ID 986–87.) This evidence weighs against a finding that the probation officer would inevitably have suspected there was pornography stored on any of the stolen items solely on the basis of his post-burglary conversation with Chapman-Sexton.

It is true that Chapman-Sexton did later inform his probation officer that Chapman-Sexton was under investigation for possessing child pornography, but that conversation occurred several days *after* the warrantless flash-drive search. (*Id.* at 982–83.) The information from that conversation, therefore, is not relevant to the inevitable-discovery analysis, which, as noted, focuses on the information available the moment *before* the warrantless search. *See Leake*, 95 F.3d at 412.

---

[3] That is how the probation officer's trial testimony paraphrased what Chapman-Sexton had told him.

But assume for the sake of argument that the probation officer would have developed suspicions about Chapman-Sexton. For the majority's analysis to work, the probation officer also would have had to tell the local authorities of his suspicion, and they might or might not have sought and might or might not have obtained a valid warrant to search the drive. Or the probation officer might have contacted federal law enforcement, but that appears even more remote, as in this case the probation officer did not talk to federal law enforcement at all until the local investigation was already well underway. Even then, the federal officers initiated contact with the probation officer, not the reverse. (*See* R. 35, Page ID 168–69; R. 68, Page ID 975, 1005.)

With respect to these first two possible chains of events, we must also remember that Coleman's reliability was in doubt. That doubt may have motivated Chief Hanzey's looking at the drive in the first place. Even assuming he would have sought a warrant without examining the drive's contents, we do not know whether the Prosecutor's Office would have found Coleman reliable. Similarly, had another local officer or a federal officer analyzed the facts available to Chief Hanzey, that officer may have chosen not to accord Coleman's statements much credence. The majority's conclusion that the evidence would inevitably have been found through legal means, therefore, depends on its assessment of various individual officers' assessments of Coleman's reliability. These credibility determinations render the inevitable-discovery exception inappropriate for use here because of our inability to see into the minds of these individuals. This court has recognized that the best inevitable-discovery analysis is one that focuses on demonstrated, objective facts:

> The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence . . . . [I]f the defendant shows that the police were not in fact following those routine procedures in the particular case, the government's evidence about what police *would have done* must bow to contrary evidence about what they *actually did*.

*United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999) (citing *Kennedy*, 61 F.3d at 500). Here, the government's arguments about what Chief Hanzey or the Prosecutor's Office "would have done" had he not viewed the flash drive "must bow" to the evidence that he in fact did view it and all subsequent actions by law enforcement occurred because of that action. *Id.* Even if Chief Hanzey had followed "routine procedures" in this case, moreover, county police would not inevitably have discovered the evidence. *Id.* To the contrary, Chief Hanzey's testimony suggested that Licking County prosecutors' routine procedure was to require police to bring them concrete evidence *before* they would seek a warrant. (*See* R. 49, Page ID 342, 393–94.)

The third possible course of events on which the majority's theory might succeed goes like this: (1) The probation officer would have become suspicious that Chapman-Sexton had pornography on one or more of the stolen devices; (2) the probation officer would have sought and obtained from law enforcement the permission to examine those items himself.

This third possible chronology suffers from the same flaws as the second possible chronology and one additional flaw. As discussed, the probation officer apparently did not suspect—until his second conversation with Chapman-Sexton, several days after the investigation had already begun—that Chapman-Sexton was in possession of child pornography. Furthermore, even then the probation officer apparently did not become aware of the flash drive's existence— or of Chapman-Sexton's ability to access the Internet with the PlayStation—immediately. To the contrary, the probation officer did not hear from Chief Hanzey about the nature of the "allegations" against Chapman-Sexton until March 2, which was several days after the investigation had commenced. (R. 68, Page ID 985.)

In addition, it is not clear, even had the probation officer become suspicious about the flash drive or the PlayStation, that he had authority to search any of Chapman-Sexton's property

himself. The supervised-release terms did not permit the probation officer to conduct a search. And once the property was in the possession of law enforcement, as it was by the time the probation officer learned of the burglary from Chapman-Sexton, the probation officer might not have been allowed to access it. He might have had to ask permission, which the authorities might or might not have granted, and even then, it is not clear the probation officer would have thought he had authority under the supervised-release conditions to search Chapman-Sexton's belongings.

In sum, any application of the inevitable-discovery doctrine to this case requires us to assume that several independent actors would have made discretionary decisions that combined to result in a valid warrant for the search of Chapman-Sexton's residence or the flash drive. But our precedent cautions us to "keep speculation at a minimum," when analyzing whether the inevitable-discovery exception fits the evidence, "by focusing on 'demonstrated historical facts capable of ready verification or impeachment.'" *Ford*, 184 F.3d at 577 (quoting *Leake*, 95 F.3d at 412); *accord Keszthelyi*, 308 F.3d at 574.

In fact, we usually apply the inevitable-discovery doctrine when the facts do not require us to make significant suppositions about the strategic decisions that independent law-enforcement officers would have made. *See, e.g.*, *Keszthelyi*, 308 F.3d at 574–75. In the paradigmatic case to apply the doctrine, such as *Nix*, a search or investigation was already ongoing, and the only question was whether the continued search or investigation, when conducted in a routine fashion, would have turned up the disputed evidence. *See* 467 U.S. at 448–50. By contrast, here, there was no indication that any law-enforcement department—local, state, or federal—was going to begin an investigation until Chief Hanzey looked at the flash drive. True, Chief Hanzey was investigating a burglary when he spoke with Deven Coleman. But the point is that Coleman's statements sparked the investigation into Chapman-Sexton's possession of child pornography, and

that investigation was colored by the warrantless search from its inception. At the time Chief Hanzey viewed the contents of the flash drive, there was no ongoing investigation of Chapman-Sexton that inevitably would have uncovered the evidence.

This court's decision in *Keszthelyi* also demonstrates the proper application of the inevitable-discovery doctrine, and it is distinguishable from this case. There, we applied the inevitable-discovery exception to a search (pursuant to a warrant) that followed (1) a legal search, (2) an illegal search, and (3) statements by three witnesses. *Keszthelyi*, 308 F.3d at 563–64. This court held that evidence found in (illegal) search #2 was admissible for two reasons. First, search #3 was legal, because the warrant affidavit contained enough information from (legal) search #1 and the witness statements to support probable cause, even absent the information from search #2.[4] *Id.* at 575. Second, search #3 would have discovered the same evidence actually found in search #2 even if search #2 had never occurred, because search #3 was equal in scope to search #2. *Id.* at 574–75.

By contrast, in this case, we do not know that Chief Hanzey would even have applied for the first warrant had he not looked at the flash drive. Or assume Chief Hanzey *had* viewed the drive, and then sought a warrant, as in fact he did. If we assume that the magistrate would have issued a warrant on the basis of the non-tainted information in the warrant affidavit alone, then

---

[4] As this recitation of the facts suggests, the facts of *Keszthelyi* may also be analyzed under the independent-source doctrine. Indeed, although the court purported to base its holding on the inevitable-discovery doctrine, it relied heavily on *Murray v. United States*, 487 U.S. 533 (1988), a foundational independent-source-doctrine case. *See Keszthelyi*, 308 F.3d at 574 (discussing *Murray*, 487 U.S. at 535–36, 541). In *Keszthelyi*, the independent source would have been the search warrant containing ample basis for a probable-cause finding absent the illegally obtained evidence. The inevitable-discovery doctrine, however, requires courts to focus on what would have happened absent the allegedly illegal search rather than on whether the evidence actually obtained through that search had an independent, valid source. Regardless, *Keszthelyi* is a better case for the inevitable-discovery exception than this case. In *Keszthelyi*, unlike in this case, law-enforcement officers had already demonstrated a willingness and ability to seek and obtain search warrants before the illegal search took place. *See id.* at 563. Therefore, the court could rely on a minimum of speculative inference about whether the officers would have obtained the evidence legally. *See id.* at 574.

maybe we could find, like the *Keszthelyi* court, that the search supported by the warrant was not "a product of" the warrantless search. *Id.* at 575. But for the inevitable-discovery doctrine (as distinct from the independent-source doctrine) to apply, we must find, not that the warrant affidavit contained probable cause absent the information found during the warrantless search, but that it contained information making it inevitable that the Licking County Prosecutor's Office would have sworn out an affidavit seeking a warrant and inevitable that a magistrate would have issued a warrant. Such inevitability is lacking because Chief Hanzey's statements about the Licking County Prosecutor's Office suggest that the office may not have sought a warrant without his having viewed the drive. Those doubts were not present in *Keszthelyi*, where officers had already obtained one valid warrant before the illegal search ever took place. *Id.* at 563.

## II.

Because I believe it is improper to affirm the district court's admission of the evidence based on the inevitable-discovery doctrine, I must ask whether another doctrine supports admissibility. The government presents three alternative bases: the good-faith exception, the "private-search" doctrine, and an argument that Chapman-Sexton (as a convicted offender on supervised release) had a "reduced expectation of privacy" in his belongings such that they could be searched without a warrant and upon reasonable suspicion. I need not consider the last alternative. Because the applicability of the private-search doctrine is a close call in this case, the good-faith exception applies to allow admission of the evidence and affirmance of the district court.[5]

---

[5] We review de novo the legal conclusions underlying a district court's denial of a motion to suppress. *United States v. Quinney*, 583 F.3d 891, 893 (6th Cir. 2009). We "may affirm on any ground supported by the record and may consider trial evidence in addition to evidence considered at the suppression hearing." *United States v. Binford*, 818 F.3d 261, 267 (6th Cir. 2016) (citing *United States v. Gill*, 685 F.3d 606, 609 (6th Cir. 2012)). Therefore, we could affirm based on any applicable exception. Because I believe that the good-faith exception would apply regardless of this court's outcome on the private-search doctrine—which would be a difficult decision requiring

The good-faith exception applies to admit evidence obtained in violation of the Fourth Amendment's requirements when the initial search was "close enough to the line of validity" that a reasonable officer could have believed it did not violate the Fourth Amendment. *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) (citation omitted); *see United States v. Leon*, 468 U.S. 897, 905 (1984). "[T]he good faith exception . . . can apply in a situation in which the affidavit supporting the search warrant is tainted by evidence obtained in violation of the Fourth Amendment." *McClain*, 444 F.3d at 565; *see id.* at 566. In *McClain*, this court held that the exclusionary rule did not apply where officers had obtained evidence during a warrantless protective sweep, which they incorrectly but reasonably believed was justified by an exigency, and had obtained a warrant based in part on that evidence. *Id.* at 565–66.

Here, like the officers in *McClain*, a reasonable officer could have believed the Fourth Amendment did not require him to get a warrant. This is because a reasonable officer could have believed the private-search doctrine, which our circuit has recognized, justified a warrantless search of the flash drive.

The seminal case for the private-search doctrine is *United States v. Jacobsen*, 466 U.S. 109 (1984). In *Jacobsen*, employees of a private carrier opened a parcel entrusted to the carrier and found it contained a white powder.[6] *Id.* at 111. The employees partially repackaged the parcel

---

harmonization of several of this court's decisions involving dissimilar fact patterns—I need not determine whether the private-search doctrine does apply on the facts of this case.

[6] In *Jacobsen*, the carrier's employees had authority to open the package pursuant to a company policy. *See* 466 U.S. at 111. Here, of course, Coleman had no authority to burgle Chapman-Sexton's house. So long as the private actor was not acting as an agent of the government, the illegality of the private actor's taking has no bearing on the legality of a subsequent search by law enforcement. *See, e.g.*, *United States v. Knoll*, 116 F.3d 994, 997–98 (2d Cir. 1997) (finding no Fourth Amendment violation when police searched defendant's files, which had been stolen by private actors and searched by the private actors before being given to the police); *see also Walter v. United States*, 447 U.S. 649, 656 (1980) ("It has . . . been settled since *Burdeau v. McDowell*, 256 U.S. 465 [1921] . . . that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and that such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." (citation omitted)).

and contacted federal law-enforcement officers, who came to the carrier's facility and opened the package again. *Id.* Without getting a warrant, the officers then took a sample of the white powder, tested it, and found that it was cocaine. *Id.* at 111–12. The Supreme Court held that the Fourth Amendment's requirements did not apply to the federal officers' search because it did not "exceed[] the scope" of the earlier search conducted by the carrier's employees. *Id.* at 115. In other words, the defendant's privacy interest in the package was no more invaded by the government's search than it had already been invaded by the employees' search.[7] *See id.*

Our court has applied the private-search doctrine numerous times. For example, in *United States v. Bowers*, 594 F.3d 522 (6th Cir. 2010), this court held that pornographic photographs found by officers looking through an album owned by the defendant were admissible, even though the officers acted without a warrant, because the officers' search followed and did not exceed the scope of a previous search conducted by the defendant's housemate, who had led the officers to the album after she learned it contained pornography. *Id.* at 527.

In *United States v. Lichtenberger*, 786 F.3d 478 (6th Cir. 2015), by contrast, this court found evidence was not admissible where an officer viewed files on a personal computer pursuant to a private actor's informing the officer that she had viewed pornography on the computer. *Id.* at 488–89. This court found that the officer could not have been certain, pre-search, that he would see only the files that the private actor had previously discovered. *Id.* Instead, the officer had run the risk of viewing personal information that was still within the defendant's legitimate expectation of privacy because the private actor had not viewed it. *Id.*

---

[7] Although the Court acknowledged that the field test did, in some sense, exceed the scope of the private search, it stated that "[a] chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy." *Jacobsen*, 466 U.S. at 123.

While finding the evidence inadmissible on the facts in *Lichtenberger*, this court reviewed prior cases, including some from other circuits, and indicated that the focus of the private-search doctrine is on whether the officers had a "virtual certainty" of uncovering nothing beyond the evidence already found by the private actor. *Id.* *Lichtenberger* also emphasized that the considerations of *Jacobsen*, when concretized in the context of searches of "complex electronic devices," *Lichtenberger*, 786 F.3d at 487, must recognize a heightened privacy interest in light of *Riley v. California*, 134 S. Ct. 2473, 2485 (2014), which held that officers must get a warrant before a search incident to arrest of a suspect's cell phone.

*Lichtenberger* dealt with pornography stored on a personal computer and did not address whether its holding extended to all electronic devices. However, several other circuits have applied the private-search doctrine to uphold warrantless searches of other types of electronic devices, and, in particular, electronic storage devices analogous to the one at issue here. For example, in *Rann v. Atchison*, 689 F.3d 832, 837 (7th Cir. 2012), the Seventh Circuit held that the private-search doctrine applied to the officers' warrantless search of a camera memory card and a zip drive that the defendants' daughter ("S.R.") and wife, respectively, brought to the officers. S.R. told the officers that the defendant had taken pornographic pictures of her. *Id.* at 834. Although the defendant argued that "the record contain[ed] no evidence that S.R. or her mother knew the digital storage devices contained images of child pornography prior to the police viewing," *id.* at 836, the Seventh Circuit stated that the Illinois Appellate Court had been reasonable in concluding that "S.R. and her mother knew exactly what the memory card and the zip drive contained," *id.* at 838. The Seventh Circuit continued:

> S.R. testified that she knew [the defendant] Rann had taken pornographic pictures of her and brought the police a memory card that contained those pictures. S.R.'s mother also brought the police a zip drive containing pornographic pictures of her daughter. Both women brought evidence supporting S.R.'s allegations to the

> police; it is entirely reasonable to conclude that they knew that the digital media devices contained that evidence.

*Id.* In holding that Rann's counsel was not ineffective for failing to move to suppress the evidence found on the memory card and zip drive, the Seventh Circuit expressly stated that the warrantless searches of those devices "did not violate the Fourth Amendment," and therefore a motion to suppress would have been futile. *Id.*

Similarly, in *United States v. Runyan*, 275 F.3d 449, 464 (5th Cir. 2001), the Fifth Circuit upheld warrantless searches of electronic storage devices based on the private-search exception. In *Runyan*, private actors had trespassed on the defendant's ranch and found a duffel bag containing pornographic photographs, as well as numerous computer disks, compact disks, and a camera. *Id.* at 453. A subsequent private search of the defendant's house revealed more compact disks, floppy disks, and zip disks. *Id.* One of the private searchers looked at "approximately twenty of the CDs and floppy disks that had been removed from the ranch and found that they contained child pornography." *Id.* The private searchers turned over the evidence to the police, who, in turn, viewed the disks without a warrant and confirmed that they contained pornography. *Id.* at 453–54.

In holding that the images viewed by police on the floppy disks and compact disks were admissible under the private-search doctrine, the Fifth Circuit stated that the focus of *Jacobsen* is on "whether the authorities obtained information with respect to which the defendant's expectation of privacy has not already been frustrated." *Runyan*, 275 F.3d at 461. After a lengthy and thoughtful analysis of *Jacobsen* and private-search cases from other circuits, see *Runyan*, 275 F.3d at 462–63, the Fifth Circuit concluded that "under *Jacobsen*, confirmation of prior knowledge does not constitute exceeding the scope of a private search," *id.* at 463. Applying this principle to the officers' searches of the disks, the Fifth Circuit held that for those disks which officers knew the

private searchers had already viewed, the warrantless searches did not exceed the scope of the private searches even though the officers "examined more files on each of the disks than did each of the private searchers." *Id.* at 464. In so holding, the court explicitly compared the electronic storage devices to closed, physical containers: "the police do not engage in a new 'search' for Fourth Amendment purposes each time they examine a particular item found within the container." *Id.* at 465.

Applying *Jacobsen*, *Bowers*, *Lichtenberger*, *Rann*, and *Runyan* to this case, it is a close call whether the private-search doctrine made Chief Hanzey's viewing the flash drive without a warrant legal. On the one hand, *Jacobsen* contains language indicating—as *Runyan* recognized— that the private-search inquiry centers on whether, from an ex post perspective (that is, after the results of the warrantless search are known), the defendant has in fact suffered a greater invasion of privacy than he had through the private search. *See Jacobsen*, 466 U.S. at 115, 117–18; *Runyan*, 275 F.3d at 463 ("*[C]onfirmation of prior knowledge* does not constitute exceeding the scope of a private search." (emphasis added)). Under this reading of *Jacobsen*, Chapman-Sexton suffered no greater invasion of privacy from Chief Hanzey's search than he did from Coleman's search: they both discovered child pornography on the flash drive. Whether Chief Hanzey viewed the identical images of child pornography previously viewed by Coleman would affect neither the incriminating effect of the images viewed nor the degree to which Chapman-Sexton's pre-search expectation of privacy was invaded.

On the other hand, *Jacobsen* also contains language indicating that the primary question is whether, from an ex ante perspective, the defendant retains any legitimate privacy interest in the thing to be searched that might be violated if officers try to replicate a private search. *See* 466 U.S. at 118–19, 120. Here, Coleman told Chief Hanzey that he had viewed child pornography on

the drive. Therefore, a reasonable officer could have expected a search of the flash drive would simply confirm what he had been told: that the drive contained child pornography, in which Chapman-Sexton had no legitimate privacy interest. But Chief Hanzey could not have been completely certain, pre-search, that he would view only child pornography or, if he did view only child pornography, that it would be the identical images Coleman claimed to have previously seen. The *Lichtenberger* court seemed to find this sort of uncertainty important, at least in the context of a personal computer. *See* 786 F.3d at 488–89; *but see Runyan*, 275 F.3d at 464. One could argue that *Lichtenberger*'s reasoning extends (though it did not explicitly say so) to all electronic devices. Therefore, I do not say that the private-search doctrine is necessarily satisfied here based on our circuit's precedent.

But I am convinced, based on the very close nature of this case under the private-search doctrine, that an objectively reasonable officer could have believed the warrantless search of the flash drive did not exceed the scope of a previous private search and therefore did not violate the Fourth Amendment. *Cf. Jacobsen*, 466 U.S. at 115. Reasonable courts have disagreed—and reasonable officers could be uncertain—about whether the best reading of *Jacobsen* requires an ex ante or an ex post analysis, or some combination of both.

In light of decisions like *Rann* and *Runyan*, a reasonable officer could believe a flash drive—which is a storage device like a camera memory card or the now-obsolescent zip drive or floppy disk—was subject to search as an electronic storage "container."[8] Indeed, *Rann*, decided a

---

[8] *Lichtenberger* did quote *Riley* for the proposition that "[o]ne of the most notable distinguishing features of modern cell phones is their immense storage capacity," thus suggesting the Court was focused on cell phones as storage devices when it found the officers' search illegal. *Lichtenberger*, 786 F.3d at 487 (quoting *Riley*, 134 S. Ct. at 2489). However, in the next breath, this court provided the context of the *Riley* quote, which made clear that the Supreme Court had determined it was the type and extent of data amassed on a cell phone, not the mere capacity to store data, that entitle owners of these "minicomputers" to a high degree of privacy in them. *See Lichtenberger*, 786 F.3d at 488 (citing *Riley*, 134 S. Ct. at 2488) ("That the item in question is an electronic device does not change the fundamentals of [the Fourth Amendment] inquiry. But under *Riley*, the *nature* of the electronic device greatly

few years before Chief Hanzey's warrantless search in this case, contains facts remarkably similar to the facts in this case. Therefore, a reasonable officer could believe that the private-search doctrine applies to an electronic storage device—here, a flash drive—and that *Lichtenberger*, which concerned only a personal computer, did not say enough to take all electronic storage devices necessarily outside the logic of cases like *Rann* and *Runyan*.[9]

Because a reasonable officer could have believed he did not need a warrant to look at the flash drive and simply confirm what Coleman had told him, the good-faith exception applies. *See McClain*, 444 F.3d at 566.[10]

---

increases the potential privacy interests at stake . . . ." (emphasis added)); *see also Riley*, 134 S. Ct. at 2485 ("Cell phones . . . place vast quantities of information literally in the hands of individuals."); *id.* at 2489 ("First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record."); *Lichtenberger*, 786 F.3d at 488 (citing *Riley*, 134 S. Ct. at 2489) ("[T]he likelihood that an electronic device will contain 1) many kinds of data, 2) in vast amounts, and 3) corresponding to a long swath of time, convinced the *Riley* Court that officers must obtain a warrant before searching such a device . . . ."). Indeed, the Supreme Court noted that "a cell phone *collects*" data. *Riley*, 134 S. Ct. at 2489 (emphasis added). Unlike a cell phone, which automatically captures an intimate and accurate compilation of information as its owner carries it throughout the day, a flash drive does not "collect" anything. It stores only what the user decides to place on it: usually files of some kind. Also, unlike a device such as a smartphone or a personal computer, a flash drive does not directly access the many sources of data, personal and otherwise, available on the Internet.

[9] Several other out-of-circuit cases reinforce my conclusion that this area of the law is cloudy enough that a reasonable officer could believe the warrantless search fell within the private-search doctrine. *Compare United States v. Odoni*, 782 F.3d 1226, 1239–40 (11th Cir. 2015) (no Fourth Amendment violation where officers searched "electronic data files" that British authorities had taken from defendant's laptop and thumb drive and sent to United States, and evidence of British agency's practice as well as testimony of British investigator indicated British authorities had already examined the files) *and United States v. Slanina*, 283 F.3d 670, 680 (5th Cir. 2002), *vacated on other grounds by Slanina v. United States*, 123 S. Ct. 69 (2002) (FBI's "exhaustive search" of defendant's "office computer equipment," following "partial[]" search by defendant's employer that did not implicate Fourth Amendment, held not to violate Fourth Amendment "even though the FBI may have looked at more files" than the employer had) *with United States v. Goodale*, 738 F.3d 917, 921 (8th Cir. 2013) (no Fourth Amendment violation where informant took defendant's laptop to police station and "showed officers the laptop's [incriminating] web history," and one officer "moved and touched the laptop for about 17 seconds," but "[n]o evidence suggest[ed] that the officer's viewing went further than [informant's] search") *and United States v. Tosti*, 733 F.3d 816, 822 (9th Cir. 2013) (no Fourth Amendment violation where officer "scroll[ed] through the images" on defendant's computer that informant "had already viewed").

[10] *Leon* describes the good-faith analysis as an objective-reasonableness test. *See* 468 U.S. at 922, 926. Although *McClain* noted the absence of evidence in that case that the officers subjectively believed they were violating the Fourth Amendment, *see* 444 F.3d at 566, there is nothing in *McClain* making subjective belief a necessary part of

Because the evidence obtained based on Chief Hanzey's warrantless search of the flash drive is exempted from the exclusionary rule by the good-faith exception, we may affirm the district court's holding even though the district court improperly conducted the *Jenkins* independent-source analysis. I therefore concur in the judgment of the majority opinion and concur in its reasoning as to all but part II.B.

---

the analysis. Indeed, the *McClain* court initially couched its good-faith analysis in objective terms. *See id.* ("We find [the Eighth Circuit's] statement of the rule in *Leon* particularly instructive: 'evidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid.'" (quoting *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989))). In addition, our post-*McClain* decisions have not treated subjective belief as a separate element of the good-faith analysis. *See, e.g.*, *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) ("[T]he objective reasonableness determination does not examine the subjective states of mind of [the particular] law enforcement officers . . . ." (second alteration in original) (citation omitted)). Therefore, *McClain*'s mention of the officers' apparent lack of subjective bad faith appears to be merely a supportive finding.